E-FILED
Monday, 11 May, 2026 01:49:09 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| RANDY FLOWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:26-cv-04062-SLD-RLH |
| | ) | |
| ILLINOIS STATE BOARD OF | ) | |
| ELECTIONS, CASANDRA B. WATSON, | ) | |
| CRISTINA CRAY, LAURA K. DONAHUE, | ) | |
| TONYA L. GENOVESE, CATHERINE S. | ) | |
| MCCRORY, JESSIE POOLE, JACK | ) | |
| VRETT, and JENNIFER M. BALLARD | ) | |
| CROFT, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Plaintiff Randy Flowers is an aspiring independent candidate for the United States House of Representatives in Illinois's 17th Congressional District. In this lawsuit, he challenges the state's ballot access requirements for independent candidates, claiming that they violate the First and Fourteenth Amendments. Before the Court is Flowers's motion for a preliminary injunction, ECF No. 3, asking the Court to enjoin the enforcement of Illinois's requirements as applied to the 17th Congressional District. Because Flowers has not established that his claim has a likelihood of success on the merits, the motion is DENIED.

**BACKGROUND**

The Illinois 17th Congressional District covers much of northwest Illinois, including the Illinois portion of the Quad Cities and substantial parts of Peoria, Rockford, and Bloomington-Normal. Flowers is a resident of the district who seeks election as its representative in Congress. Am. Compl. 3, ECF No. 24. As part of this campaign, Flowers wishes to be listed on the general election ballot as an independent candidate. *See generally id.*

1

Eligibility for ballot access is governed by the Illinois Election Code.  *See* 10 ILCS 5/1-1 to 5/30-3.  Ballot access requirements differ with respect to three categories of candidates: candidates of an "established political party," candidates of a new political party, and independent candidates.  *See id.* § 5/7-2, 10-2, 10-3.  A political party can be established within the State as a whole or within a particular district.  *Id.* § 5/10-2.  To be an established political party as to the State, a party must have received more than 5% of the entire vote cast for governor in the last general election.  *Id.*  To be an established political party as to a district, it must have received more than 5% of the entire vote cast for the representative of that district in the last general election.  *Id.*  Other parties are not recognized as established political parties and must follow enumerated procedures to form a new political party if they desire to put forth candidates to run for office.  *See id.* §§ 5/10-2, 10-5.

If more than one individual seeks to receive an established party's nomination, the candidates must compete in a party primary.  *Id.* § 5/7-5(b).  To be listed on the ballot for the primary, candidates seeking to run for United States Congress must submit a petition for nomination containing signatures equal to at least 0.5% of the qualified primary electors of their party within the congressional district.  *Id.* § 5/7-10(b).  A primary candidate who does not attain the party's nomination may not be listed on the ballot as an independent candidate or as a candidate of a new political party.  *Id.* §§ 5/7-43, 10-2.

Independent candidates and candidates of new political parties for United States Congress do not go through a primary process.  Instead, to be listed on the ballot for the general election, they must submit a nominating petition including signatures of at least 5% of the total voters who voted within the congressional district in the last general election.  *Id.* §§ 5/10-2, 10-3.

In practice, this means Republican Congressional candidates in the 17th District must submit petitions containing at least 744 signatures to be listed on the primary ballot.  Illinois State Board of Elections, 2026 Candidate's Guide 28 (2026), https://www.elections.il.gov/NewDocDisplay.aspx?%2fM0cs48zOKVZyk9eAbpEoxjoGz9b5Ya GE%2bEuf7JVd2Tlx2Mybp2RbacEJVh848tnFOLoTd3G4cRsCxSj%2bcrL1MmhG9QsYgJ9O QfN8tD1KklF6m89KlYSnqSZ0WOmujQNns%2fMKKc1nxvFYr0NAIKrFNNB1uL%2bNA8jn JGbKqcy9aI%3d.  Democratic candidates need at least 852 signatures.  *Id.*  Independent and new party candidates must submit a petition containing at least 16,035 signatures to be listed on the general election ballot.  *Id.*  All signatures must be from registered voters in the district, and the address the signer provides on the petition must match the address at which he or she is registered to vote.  10 ILCS 5/7-10, 10-4, 3-1.2.  Signers may not sign petitions for more than one established political party, *id.* § 5/7-10, nor may they sign petitions for more than one independent or new party candidate, *id.* § 5/10-3.

For each type of candidate, there is a filing period during which individuals must submit their petitions, including all necessary signatures.  Candidates for nomination by an established political party must file not more than 141 nor less than 134 days prior to the primary election.  10 ILCS 5/7-12(1).  Independent and new political party candidates must file not more than 169 days nor less than 162 days prior to the general election.  *Id.* § 5/10-6.  In 2026, the 162-day deadline falls on May 26.  2026 Candidate's Guide 27.  Candidates may begin circulating petitions to gather signatures beginning 90 days before the last day of their filing period.  10 ILCS 5/7-10, 10-4.  Various restrictions apply to this process: all signatures must be in the presence of the person circulating the petitions, and the circulator must be at least 18 years of age, must be a United States citizen, and may only circulate petitions for one candidate.  *Id.* §§ 7-

3

10, 10-4.  The circulator must submit a sworn and notarized statement at the bottom of each petition sheet attesting to their qualifications to serve as a circulator and that the signatures were signed in their presence.  *Id.* §§ 7-10, 10-4.

On March 4, 2026, Flowers brought suit against the Illinois State Board of Elections and its members,[1] alleging that the enforcement of the Illinois Election Code unlawfully burdened his First and Fourteenth Amendment rights of political association, political expression, and equal protection under the law.  Compl. 1, ECF No. 1.  That same day, he moved for a preliminary injunction barring Defendants from enforcing the Illinois Election Code's signature and timing requirements for independent candidates.  *See* Mot. Inj. 2.[2]  Defendants respond that (1) the Court lacks jurisdiction to consider the case because Flowers lacks standing and his claim is not ripe, Resp. Mot. Inj. 4–5, ECF No. 22, (2) Flowers is not entitled to an injunction because he has no chance of success on the merits, *id.* at 5–18, (3) an injunction is improper because Flowers has not demonstrated irreparable harm, *id.* at 18–19, and (4) the Court should not issue an injunction as the balance of harms favors Defendants, *id.* at 19–21.

After Defendants submitted their brief, Flowers filed an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(1).  *See generally* Am. Compl.  The amended complaint brings the same basic allegations that the Illinois Election Code is unconstitutional because it creates an unequal signature requirement for independent candidates as opposed to candidates of established political parties and restricts signature-gathering to a narrow ninety-day circulation period.  *Compare* Compl. 2–7, *with* Am. Compl. 4–6.  Flowers argues that the burden is

---

[1] Flowers also filed suit against Bernadette Matthews, Jeremy Kirk, and Karen Kinney, the Rock Island County Clerk.  *See* Compl. 1, ECF No. 1.  He has since amended his complaint to remove any claims against these individuals.  *See* Am. Compl. 1.

[2] Neither the motion nor the accompanying memorandum of law are paginated.  For ease of reference, the Court refers to the page numbers generated by CM/ECF when citing the motion and its supporting memorandum of law.

exacerbated by the geographic breadth (and harsh climate) of the 17th Congressional District that complicates the logistics of gathering signatures in a short period of time. *See* Am. Compl. 7–8, 12–15. Because the Amended Complaint re-pleads the same basic claim, Flowers's motion for a preliminary injunction remains a live dispute, and the pre-amendment briefing remains sufficient to rule on the motion.

## DISCUSSION

### I.    Standing

Before turning to the propriety of a preliminary injunction, the Court addresses whether it has jurisdiction over Flowers's claim. The Court can only adjudicate Flowers's claim if he has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Because standing is a jurisdictional requirement, *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020), courts "have an obligation to assure [them]selves of litigants' standing under Article III." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (quotation marks omitted). As a result, although Defendants raise their standing argument only in opposition to Flowers's motion for a preliminary injunction, if the Court determines that Flowers lacks standing to pursue his cause of action, it is obligated to dismiss the case.

A party has standing to bring suit if it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy the injury-in-fact prong, "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (quotation marks omitted). Thus, "threatened

injury must be *certainly impending* to constitute injury in fact . . . allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks and alteration omitted).

Defendants argue that Flowers has not suffered an injury in fact because "[he] has not failed to obtain the requisite number of signatures—he still has time to collect—and neither the Board nor any third party has raised any objection to Plaintiff's petition." Resp. Mot. Inj. 5. This misstates the nature of Flowers's injury. When a candidate is "required to allocate additional campaign resources to gather signatures," that alone "can be an injury to First Amendment rights." *Krislov v. Rednour*, 226 F.3d 851, 857 (7th Cir. 2000). While Flowers cannot yet know whether he will gather sufficient signatures to comply with the Election Code, "it [is] certain that it [will] cost him more to do so than if the challenged provisions [are] invalidated." *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004). Because the Election Code has already injured Flowers by requiring his campaign to expend additional resources to gather signatures, there is "no question of his standing." *Id.* at 736. The Court therefore turns to the merits of Flowers's motion for a preliminary injunction.

## II. Preliminary Injunction

### a. Legal Standard

A plaintiff seeking a preliminary injunction must establish (1) that he has some likelihood of success on the merits, (2) that he will suffer irreparable harm without an injunction, and (3) that traditional legal remedies would be inadequate. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To prove some likelihood of success on the merits, the plaintiff "must establish that he is *likely* to succeed on the merits," *Winter*, 555 U.S. at 20 (emphasis added), not merely that success is possible, *see Mays*,

6

974 F.3d at 822 (holding that a "better than negligible" chance of success is not enough to support the grant of a preliminary injunction).

If the plaintiff satisfies this initial burden, the court weighs "the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). In the Seventh Circuit, this is done using a "sliding scale" approach: the higher the plaintiff's likelihood of success on the merits, the less the balance of harms needs to weigh in his favor. *Id.*

### b. Analysis

#### i. Likelihood of Success on the Merits

In his Amended Complaint, Flowers brings six counts, all challenging the constitutionality of Illinois's ballot access requirements: Count I for a violation of the First and Fourteenth Amendments, Count II for a denial of the Fourteenth Amendment's guarantee of equal protection of the law, Count III for a violation of the fundamental right to no taxation without representation under the First and Fourteenth Amendments, Count IV for a denial of due process under the Fourteenth Amendment, Count V for declaratory judgment, and Count VI for injunctive relief.[3] *See* Am. Compl. 17–23.

Though styled as individual counts, Flowers's complaint in effect brings a single claim that the Illinois Election Code violates his constitutional rights under the First and Fourteenth Amendments. It is well-established that such claims are subject to a single constitutional analysis. *See Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997) (describing the single analysis that courts use "[w]hen reviewing challenges to a state's election laws");

---

[3] Count V and VI, which seek declaratory judgment that Illinois's signature requirement violates the constitutional rights of independent candidates in the 17th Congressional District and injunctive relief barring the enforcement of the 5% signature requirement against independent congressional candidates, respectively, *see* Am. Compl. 23–24, are questions of remedies and will not be assessed as counts for which Flowers is likely or unlikely to succeed.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (outlining the test to use when "considering a challenge to a state election law"); *Navarro v. Neal*, 716 F.3d 425, 430 (7th Cir. 2013) ("To assess the constitutionality of ballot access laws, we engage in a two-step inquiry."); *Anderson v. Celebrezze*, 460 U.S. 780, 786 n.7 (1983) (stating, in the context of a similar challenge to a state election code, that "we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis"). In short, there is one constitutional test that is used to weigh the propriety of ballot access requirements. The Court, therefore, proceeds to consider Flowers's claims together.

The First Amendment, as incorporated against the states by the Fourteenth, "protects the right of citizens to band together in promoting among the electorate candidates who espouse their political views." *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (quotation marks omitted). Consequently, restrictions on ballot access "burden two distinct and fundamental rights, 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). To be sure, the primary concern is in the right of voters to support candidates and their associated political platforms, *Anderson*, 460 U.S. at 806, but in cases such as this, "the rights of voters and the rights of candidates do not lend themselves to neat separation," *Bullock v. Carter*, 405 U.S. 134, 143 (1972).

As with many constitutional rights, these associational rights are not absolute. *Burdick*, 504 U.S. at 433. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Restrictions on ballot access

8

are one mode of ensuring the efficacy of the electoral process.  *See Anderson*, 460 U.S. at 788 n.9 ("[I]t is both wasteful and confusing to encumber the ballot with the names of frivolous candidates."); *Nader*, 385 F.3d at 733 (recognizing that there must be some restrictions on ballot access because the boundless proliferation of candidates harms the electoral process).

In determining whether ballot access restrictions unconstitutionally burden the associational rights of candidates and voters, courts must examine "the character and magnitude of the burden and the extent to which the law serves the State's interests."  *Krislov*, 226 F.3d at 859–60 (citing *Anderson*, 460 U.S. at 789; *Burdick*, 504 U.S. at 434).  This analysis contains two steps.  First, the court determines "the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."  *Burdick*, 504 U.S. at 434.  This is ultimately a question of "whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot."  *Stone v. Bd. of Election Comm'rs for Chi.*, 750 F.3d 678, 682 (7th Cir. 2014) (quotation marks omitted).  Second, the court applies a sliding-scale scrutiny wherein the level of scrutiny depends on the extent of the burden.  *Burdick*, 504 U.S. at 434.  If the regulation severely restricts constitutional rights, then "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'"  *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).  "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."  *Id.* (quoting *Anderson*, 460 U.S. at 788).

### 1. Burden

Flowers suggests that the Court need look no further than the 5% signature requirement, which is constitutionally infirm "even viewed in isolation." Reply 6, ECF No. 25. However, this claim cannot withstand scrutiny.

The Supreme Court first pronounced a signature requirement unconstitutional in *Williams*. The Ohio law in question required third-party candidates to obtain signatures "totaling 15% of the number of ballots cast in the last preceding gubernatorial election." *Williams*, 393 U.S. at 24–25. It also required third parties to construct elaborate party machinery including a state central committee and delegates to a national convention, which functionally demanded the commitment of over 1,200 members who had not previously voted in another party's primary who would be willing to serve as committeemen and delegates. *Id.* at 25 n.1. The Court held that the law "g[a]ve the two old, established parties a decided advantage over any new parties struggling for existence and thus place[d] substantially unequal burdens on both the right to vote and the right to associate." *Id.* at 31. In combination with the organizational demands on new parties, the signature requirement was unconstitutional because it "protect[ed] the Republican and Democratic parties from external competition" and caused "the virtual exclusion of other political aspirants from the political arena." *Anderson*, 460 U.S. at 802.

Though *Williams* announced the possibility that signature requirements may be unconstitutional, the Supreme Court has since approved lower signature requirements that do not functionally exclude independent and third-party candidates from the political process. Most notably, in *Jenness v. Fortson*, 403 U.S. 431 (1971), the Court upheld Georgia's requirement that independent candidates submit a petition signed by "at least 5% of the number of registered voters at the last general election for the office in question." *Id.* at 432. Georgia's signature

10

requirement was found constitutional even though it was "apparently somewhat higher than the percentage of support required to be shown in many States." *Id.* at 442.

When considering the applicability of *Jenness* to different election codes, many courts have hypothesized that *Jenness* may be something of a constitutional outer limit on signature requirements. *See, e.g.*, *Lee v. Keith*, 463 F.3d 763, 771 (7th Cir. 2006). Even if this is true, Illinois's requirement falls far short of this outer limit since Illinois requires signatures equal to 5% of *actual votes* at the last election, not 5% of all *registered voters*, a meaningfully larger denominator. *See Tripp v. Scholz*, 872 F.3d 857, 865 (7th Cir. 2017).

Relying on *Jenness*, many courts have upheld signature requirements similar to that faced by Flowers. For example, in *American Party of Texas v. White*, 415 U.S. 767 (1974), the Supreme Court approved a provision of the Texas Election Code requiring independent and minority political party candidates to submit signatures of—depending on the office—either 3% or 5% of the vote cast for governor in that district in the last election. *Id.* at 788–90. And in 2017, the Seventh Circuit in *Tripp* considered a previous, nearly identical version of Illinois's Election Code. The Election Code required new party candidates to submit a nomination petition including signatures of individuals equal to 5% of those who voted in the previous election for the office at issue. *Tripp*, 872 F.3d at 860. The court held that "the 5% signature requirement, standing alone, is not severe." *Id.* at 866. On the whole, in light of *Jenness* and its progeny, "[Flowers] cannot argue that the 5% petitioning requirement is severe on its face." *Libertarian Party of Ill.*, 108 F.3d at 775.

Next, early filing deadlines can independently impose a severe burden, but the circumstances in which they have been found to be unconstitutional are not analogous to the deadline in this case. The Supreme Court in *Anderson* considered whether Ohio's March 20

11

filing deadline for independent candidates unconstitutionally burdened voting and associational rights. *Anderson*, 460 U.S. at 782–83. The Court found the deadline unconstitutional in part because it was five months before even the primary elections, so it was difficult for independent candidates to recruit volunteers, solicit campaign contributions, or garner publicity because voters were not yet interested in election campaigns. *Id.* at 791–92. However, deadlines much closer to Illinois's 162-day deadline—falling this year on May 26—have been upheld. *See, e.g.*, *Jenness*, 403 U.S. at 433–34 (finding ballot restrictions including a filing deadline the second Wednesday in June constitutional); *Nader*, 385 F.3d at 735–36 (affirming denial of motion seeking to enjoin ballot access requirement that, *inter alia*, third party candidates file nominating petition 134 days before the general election). In this case, not only is the deadline closer to those in *Jenness* and *Nader* than that in *Anderson*, but it is also well after Illinois's primary election, held on the third Tuesday in March, *see* 10 ILCS 5/2A-1.1(a). Consequently, much of the reasoning of *Anderson* does not apply.

None of the other ballot access requirements created by the Election Code, considered alone, impose a severe burden on Flowers's constitutional rights either. Courts have regularly upheld ballot access schemes with 90-day or shorter petitioning windows. *See, e.g.*, *Nader*, 385 F.3d at 731, 736–37 (90 days); *Tripp*, 872 F.3d at 860, 870–72 (90 days); *Stone*, 750 F.3d at 680, 684–86 (90 days); *Am. Party of Tx.*, 415 U.S. at 786 (55 days). Similar restrictions on who can sign nominating petitions have also routinely been found constitutional. *See, e.g.*, *Stone*, 750 F.3d at 680, 684 (considering scheme in which "voters may not sign more than one nominating petition for the same office in a single election cycle"); *Am. Party of Tx.*, 415 U.S. at 778, 789 (considering scheme requiring signatures to be administered and signed with a notarized oath and barring those who voted in party primaries from signing independent petitions); *Nader*, 385

F.3d at 731, 734 (considering scheme requiring signatories to provide an address that is the same as the address where they are registered to vote); *Tripp*, 872 F.3d at 860, 868–70 (considering scheme requiring each circulator to sign a notarized affidavit at the bottom of each signature sheet).

Of course, "[r]estrictions on candidacy must . . . be considered together rather than separately." *Nader*, 385 F.3d at 735. When combined, although Illinois's ballot access requirements impose a moderate burden, the burden cannot be considered severe.

Prior cases have evaluated the constitutionality of remarkably similar, prior versions of the Illinois Election Code and found that the burden of the ballot access requirements was not severe. Most notably, the *Tripp* court in 2017 assessed the Election Code's requirement that new party candidates for state representative submit a nominating petition including signatures equal to 5% of voters who voted in the previous election, gathered during a 90-day petitioning window ending on June 23, circulated by an individual who signed a notarized affidavit at the bottom of each signature page attesting that certain qualifying criteria were met. *See Tripp*, 872 F.3d at 860. The Seventh Circuit held that neither the 5% signature requirement nor the affidavit requirement alone created a severe burden, *see id.* at 864, 866, and that considering their combined effect along with "the ninety-day petitioning window and geographic layout of the districts at issue . . . d[id] not dramatically tilt the constitutional scales." *Id.* at 870. Similarly, in *Gill v. Scholz*, No. 3:16-cv-03221-SLD-EIL, 2022 WL 992729 (C.D. Ill. Mar. 31, 2022), *vacated and remanded on sub nom. Gill v. Linnabary*, 63 F.4th 609 (7th Cir. 2023) ["*Gill I*"],[4] this Court considered essentially the same statutory scheme as that analyzed in *Tripp* and held that the

---

[4] *Gill* was vacated by the Seventh Circuit because subsequent redistricting in Illinois mooted the dispute, *Gill v. Linnabary*, 63 F.4th at 615, but the reasoning remains persuasive.

plaintiffs "failed to satisfy their burden of showing that the cumulative barriers to ballot entry in Illinois are severely burdensome." *Id.* at *12. *Tripp* does not control given the fact-intensive analysis of the *Anderson-Burdick* framework—especially since the *Tripp* plaintiff faced a numerical signature requirement unique to election years following redistricting—*see Gill v. Scholz*, 962 F.3d 360, 366 (7th Cir. 2020) ["*Gill II*"], but its reasoning remains instructive in determining what weight to give the arguments advanced by Flowers.

Also informative is the Supreme Court's analysis in *Storer*, which considered California's requirement that candidates submit signatures equal to 5% of those who voted in the previous general election. *Storer*, 415 U.S. at 726–27. California had a tighter, 24-day signature window and also prevented independent candidates from gathering signatures from individuals who had voted in the primary election. *Id.* The Supreme Court ultimately reversed the District Court's conclusion that California's election laws were constitutional, but it did so only because the District Court did not consider sufficient facts—especially how many potential signers were ineligible by virtue of voting in the primary. *Id.* at 738–40. In doing so, the Court stated that "[s]tanding alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden," and that "[o]n its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President." *Id.* at 740. The Court's reasoning in *Storer* suggests that issuing a preliminary injunction in this case is improper. Like the California law, Illinois's election code does not on its face make it impracticable to appear on the ballot. And since Illinois does not bar primary voters from signing petitions for independent candidates, the central concern of the *Storer* court is not present in this case.

Flowers contends that, in addition to the statutory requirements discussed above—the 5% signature requirement, the 90-day petitioning window, the early filing deadline, and the

restrictions on who can sign nominating petitions—the Election Code creates a severe burden as applied to the 17th Congressional District for several practical reasons. First, the 17th District is large. Driving distance from one end to the other is approximately 145 miles, "requiring approximately 2 hours and 40 minutes of one-way travel time." Am. Compl. 7. Second, "[t]he 90-day petition-circulation window for the 2025-2026 election cycle runs from February 25 through May 26, 2026, beginning in the dead of winter in western Illinois." *Id.* at 12. As a result, independent candidates in 2026 were forced to contend with extreme weather, including cold, a blizzard, and frequent rain and wind. *See id.* at 12–16. Third, "signature invalidation rates [in Illinois] frequently range from 30% to 60%, [so] a prudent candidate must collect roughly 23,000 to 40,000 raw signatures merely to survive the challenge process." Reply 11. Despite Flowers's insistence, none of these specific considerations is of such constitutional gravity as to support a finding that the burden is severe.

First, the geography of the 17th District is not such that the Election Code creates a severe burden. It is large, but not uniquely so. Consider *Tripp*: the plaintiffs in that case were candidates for state representative in districts that "cover[ed] approximately 2,808 and 1,810 square miles, with population densities of 38.72 and 60.07 people per square mile, respectively." *Tripp*, 872 F.3d at 871. Although the 17th District is larger than those in *Tripp*, "[Flowers's] emphasis on mere mileage . . . is misplaced." *Id.* The 17th Congressional District is large, at 4,481.9 square miles,[5] but it is also—at 165.9 people per square mile—substantially more dense than the districts in *Tripp*. *See Congressional District 17, IL*,

---

[5] The 17th District is large, but by no means abnormally so. Just in Illinois, the 12th District is 14,016 square miles in size and has a population density of only 53.2 people per square mile. *Congressional District 12, IL*, https://censusreporter.org/profiles/50000US1712-congressional-district-12-il/ (last accessed May 7, 2026). The 15th District is 16,752.8 square miles with 44.1 people per square mile. *Congressional District 15, IL*, https://censusreporter.org/profiles/50000US1715-congressional-district-15-il/ (last accessed May 7, 2026). And, of course, states as large as Wyoming and Alaska consist of single, at large congressional districts.

https://censusreporter.org/profiles/50000US1717-congressional-district-17-il/ (last accessed May 7, 2026).  Further, the 17th District contains at least substantial parts of Rockford, Peoria, Bloomington-Normal, and Rock Island/Moline.  *Id.*  So, like in *Tripp*, the 17th District "boast[s] population centers that far exceed the number of required petition signatures."  *Tripp*, 872 F.3d at 871–72.  And despite the large area, the time it takes to traverse the miles between population centers may not be substantially worse than in smaller districts with less favorable road and traffic conditions.  *Id.* at 871.

Moreover, Flowers's description of unmanageable travel times seems to assume that he will petition for signatures by himself.  Individuals aspiring to win a seat in the United States Congress should be able to count on support from volunteer circulators throughout the district since "[h]ard work and sacrifice by dedicated volunteers are the lifeblood of any political organization."  *Am. Party of Tx.*, 415 U.S. at 787.  Enlisting circulators even in only the four largest population centers in the 17th District would provide access to a substantial amount of the district's population with very little travel.

Second, Flowers gives no reason to believe the weather during the petitioning window is constitutionally relevant.  He does not mention the weather data in his motion for a preliminary injunction or his reply in support, and his amended complaint does not identify any legal authority suggesting that weather patterns can make the burden of ballot access requirements substantial.  Even if relevant, the weather described by Flowers is not so extreme as to meaningfully alter the Court's analysis.  Of the 52 days of weather reported by Flowers, only two days had highs below freezing, and less than half of the days had more than trace amounts of precipitation.  *See* Am. Compl. 14–15.  And while the Court does not contest that severe weather

16

can prevent certain types of canvassing, it is not unreasonable to expect aspiring United States

congressmen to continue their campaign activity despite the presence of wind and/or rain.

Third, Flowers's argument about signature invalidation also does not show that the ballot

access restrictions pose a severe burden. Preliminarily, the source of Flowers's stated 30–60%

invalidation rate is not clear.[6] He cites *Lee*, 463 F.3d at 767–68, for this proposition, *see* Mot.

Inj. 5, but nothing in that opinion supports such a finding. In any event, while it is obvious that

Illinois's 5% signature requirement is formally lower than that in *Jenness* (by virtue of

considering only voters in the previous election, not all registered voters), assuming the 30–60%

invalidation rate is accurate, it is unclear how Illinois's requirement would compare to that in

*Jenness* and elsewhere since there has been no showing of how many registered voters there are

in the 17th District or how many voters are ineligible to sign petitions for independent

candidates. Since Flowers seeks a preliminary injunction, he must "make a strong showing that

reveals how [he] proposes to prove [his] case." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188

(7th Cir. 2023) (quotation marks omitted). He cannot rest on the allegations of his complaint,

*see, e.g.*, Reply 4–5 (arguing that Flowers "pleads concrete, quantified burdens—including . . .

the 30%–60% invalidation rate"), to make the evidentiary showing that is necessary to obtain a

preliminary injunction.

In short, Flowers has not shown that the burden imposed by the Illinois Election Code is

severe, especially given its marked similarity to the requirements present in several other election

codes that have been upheld by the Supreme Court and Seventh Circuit.

A brief survey of the recent history of ballot access for independent Congressional

candidates in Illinois highlights the surmountability of the burden. Defendants point to eight

---

[6] In *Nader*, nearly one-third of the plaintiff's signatures were invalidated. *Nader*, 385 F.3d at 734. But there is no evidence that this was a representative rate or, if it was, that it remains the prevailing invalidation rate in Illinois.

candidates since 2000 who have met the 5% signature requirement either as an independent or as a new party candidate. Resp. Mot. Inj. 10. Two of these were independent candidates. *Id.* Flowers does not contest this characterization. *See generally* Reply. In its own review of the data, the Court identified seven independent candidates since 2010 who have been listed on the ballot for the general election as candidates for United States Representative. *See Election Results*, Ill. State Bd. of Elections, https://www.elections.il.gov/ElectionOperations/ElectionVoteTotals.aspx (last accessed May 5, 2026). These are: Jerico Matias Cruz, 5th District, 2022; Tracy Jennings, 7th District, 2020; Thomas Rudbeck, 1st District, 2018; Marcus Lewis, 2nd District, 2012; John H. Monaghan, 7th District, 2012; John Hartman, 13th District, 2012; and Clarence Clemons, 7th District, 2010. *Id.*

Regardless of whether these candidates appeared on the ballot through meeting the 5% signature threshold, *see Gill I*, 2022 WL 992729, at *11–12 (describing alternative methods through which independent candidates could be listed on the ballot, such as if their petitions were not objected to); *Gill II*, 962 F.3d at 366 (acknowledging that, under the Illinois Election Code, signature requirements are different in election years following redistricting), the regular presence of independents on the ballot suggests that the Illinois Election code does not "operate to prevent such a group from ever getting on the ballot," *Williams*, 393 U.S. at 33, or "freeze the political status quo," *Jenness*, 403 U.S. at 438.

Flowers contends that this data is unconvincing in light of the fact that no independent candidate has ever been listed on the ballot for the 17th District. *See* Mot. Inj. 5. However, Flowers presents no evidence of how many independent candidates have attempted to be listed on the general election ballot in the 17th District. *See generally id.* And regardless, an inference can still be drawn from the experience of independent candidates in other districts that the

18

Illinois Election Code does not prevent ballot access.  As discussed above, the geography of the 17th District is not so unique as to prevent this inference.

In short, ballot access history shows that "a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot."  *Stone*, 750 F.3d at 682 (quotation marks omitted).  Weighed against this benchmark, the burden imposed by the Election Code, though not negligible, cannot be deemed severe.

To avoid this necessary conclusion, Flowers argues that *Lee* is "[d]irectly on [p]oint" and requires a finding that the Election Code severely burdens independent candidate's constitutional rights.  Reply 2, 5–7.  In *Lee*, the Seventh Circuit found unconstitutional a prior version of the Illinois Election code that required independent candidates to secure signatures equal to 10% of the number of votes cast in the last general election and to file their petitions 323 days before the general election.  *Lee*, 463 F.3d at 765.  Flowers acknowledges that the Illinois reduced the signature requirement from 10% to 5% but argues that this was "at best, a half-measure that did not cure the constitutional defect."  Reply 6.  He emphasizes that *Lee* "was not solely about the 10% figure," but about the combined effect of the various provisions of the Election Code.  *Id.*

Flowers is correct that *Lee* considered the combined burden of the various ballot access requirements, but he is wrong that Illinois's subsequent amendments to the election code are not constitutionally significant.  First, the *Lee* court underscored that Illinois's signature requirement was effectively higher even than states that, like Georgia in *Jenness*, "require candidates to collect signatures from 5% of all *registered* voters."  *Lee*, 463 F.3d at 769.  That is, while Flowers is correct that half of a severe burden may still be severe, he misreads *Lee* to assume that the difference between 10% and 5% is insignificant.  Second, Flowers's argument fails because Illinois not only cut in half the signature requirement, but it also moved the filing deadline from

19

323 to 162 days before the general election.  It is thus disingenuous to suggest that the concerns of the *Lee* court have not been addressed—the two primary components of the disfavored election code have *both* been cut in *half*.  While the Court must still weigh the facts of this case against the Seventh Circuit's reasoning in *Lee*, its holding does not control.

Flowers next argues that *Lee* should control because, despite the move from a 10% to a 5% signature requirement, "[t]he proper comparison is not between the current requirement and the prior one, but between the burden imposed on independent candidates and the burden imposed on major-party candidates seeking the same office."  Reply 6.  This is also incorrect. The proper comparison is not to either the prior regulation or the signature requirement for established-party candidates, but to the constitutional standard that considers "whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot."  *Stone*, 750 F.3d at 682 (quotation marks omitted).  For the reasons stated above, a reasonably diligent candidate could be expected to gain a place on the ballot under Illinois's Election Code.  It therefore does not impose a substantial burden.

Flowers's final argument is also his most vehement: whatever the validity of ballot access restrictions standing alone, the extreme disparity between the signature requirements for independent candidates and established party candidates is nothing more than the discriminatory exclusion of independent candidates.  *See* Reply 3.  It thus can only be constitutional, he continues, if it is narrowly drawn to advance a compelling state interest.  *See id.*  He maintains that it is wrong to accept the Seventh Circuit's conclusion that to compare the two signature requirements is "to compare apples with oranges," *Libertarian Party of Ill.*, 108 F.3d at 776.  *See* Reply 8.  Flowers says that even if political parties have shown a modicum of support, the

individual candidates nominated by political parties have not, so the fact that candidates for the same general election ballot have different signature requirements is a discriminatory burden.

This argument, too, cannot prevail. Admittedly, ballot access requirements may be subject to strict scrutiny if they are discriminatory. *See Burdick*, 504 U.S. at 434. But Flowers ignores the reality that established party candidates must traverse a primary process, which itself establishes substantial support for the eventual nominee. Moreover, it is not self-evident that the signature requirement for independent candidates is more burdensome than the primary gauntlet faced by established party candidates. *Jenness*, 403 U.S. at 440. Because independent and established party candidates are differently situated, the Seventh Circuit has flatly rejected Flowers's contention. *See Libertarian Party of Ill.*, 108 F.3d at 776 (approving a substantial signature disparity because independent candidates had not yet demonstrated a significant modicum of support); *Tripp*, 872 F.3d at 865–66 (holding that an identical disparity was necessary to ensure new party candidates had a modicum of support). "The two petitioning requirements contain different percentages because they are used at two different times for two different purposes." *Libertarian Party of Ill.*, 108 F.3d at 776. In light of the Election Code as a whole, the differing signature requirements cannot be considered discriminatory and do not merit strict scrutiny.

### 2. Tailoring

Because the Election Code imposes only a moderate burden that "cannot be fairly characterized as 'severe,'" it will be upheld if supported by "relevant and legitimate state interests sufficiently weighty to justify the limitation[s]." *Tripp*, 872 F.3d at 869 (quotation marks omitted). This means Illinois's ballot access requirements will only be struck down if they are "unreasonable." *Id.* at 870 (quotation marks omitted); *see also Libertarian Party of Ill.*,

108 F.3d at 776 (holding that ballot access requirements were not unconstitutional because they "further[ed] the State's important interests in a rational manner"); *Stone*, 750 F.3d at 681 ("If the burden is merely reasonable and nondiscriminatory, . . . the government's legitimate regulatory interests will generally carry the day." (quotation marks omitted)).

Illinois's asserted interest is "to protect the election process" by requiring candidates to demonstrate a modicum of support before acquiring ballot access in order to prevent voter confusion, ballot overcrowding, or the presence of frivolous candidates. Resp. Mot. Inj. 5.

These interests have repeatedly been found to be important. As immediately relevant here, the *Jenness* court affirmed that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness*, 403 U.S. at 442. In the words of the Seventh Circuit, "[t]here is ample caselaw supporting the proposition that ballot access laws serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections." *Navarro*, 716 F.3d at 431 (collecting cases).

Moreover, binding case law has consistently held that similar ballot access restrictions directly further materially identical asserted interests. *See Stone*, 750 F.3d at 685 ("There is no question that the 12,500-signature requirement and accompanying rules[—namely, a 90-day petitioning window; requirement that voters sign no more than one nominating petition—]serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections." (quotation marks omitted)); *Libertarian Party of Ill.*, 108 F.3d at 775 (holding that a signature requirement disparity between

22

new party candidates—the greater of 25,000 or 5% of votes cast in last election—and established party candidates—0.5% of qualified primary electors—"serves the State's important interest of ensuring that a political party that is new in a particular political subdivision demonstrates a modicum of public support before it can place its candidates on an election ballot"); *Tripp*, 872 F.3d at 866 (concluding that Illinois's "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot" sufficiently supported Illinois's 5% signature requirement (quotation marks omitted)).  The Court is convinced by the reasoning of these cases that the ballot access restrictions chosen by Illinois in its Election Code directly further its important interest in protecting the election process.

Flowers argues that Illinois's interests could be met with less restrictive alternatives.  *See* Reply 9 ("Reasonable filing fees, modest and uniform signature thresholds applied equally to all candidates regardless of party affiliation, or demonstrated community support through a nondiscriminatory signature requirement would each serve the State's interest in screening out frivolous candidacies . . . .").  But even if the early deadline or extent of the signature requirement are not precisely necessary—perhaps 150-days or a 4% requirement could accomplish these same interests—it is not the Court's job to wade into such policymaking waters when the regulations further legitimate interests.  *See Tripp*, 872 F.3d at 870 ("Ultimately, this Court need not enter the policy fray.  Because the notarization requirement does not impose a severe burden, it need not be narrowly tailored."); *see also Nader*, 385 F.3d at 735 ("We cannot micromanage the regulation of the electoral process to the degree he seeks.").

As the Court concluded in *Stone*,

[Illinois's] approach undoubtedly places some burden on candidates and their supporters, who must work to gather the necessary signatures.  But the scheme

leaves room for reasonably diligent candidates to get on the ballot even as it directly furthers the state's legitimate interests in avoiding ballot overcrowding and preventing voter confusion. These interests are strong enough to justify the reasonable, nondiscriminatory burden on the plaintiffs' First and Fourteenth Amendment rights.

*Stone*, 750 F.3d at 685.

In sum, Flowers's chance of success on the merits is negligible. He therefore has not shown that he has "some likelihood of success on the merits." *Mays*, 974 F.3d at 822 (quotation marks omitted); *see id.* (holding that under the standard for a preliminary injunction, a plaintiff must do more than establish a "better than negligible" chance of success).

## CONCLUSION

Accordingly, Plaintiff Randy Flowers's motion for a preliminary injunction, ECF No. 3, is DENIED.

Entered this 11th day of May, 2026.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
