E-FILED
Monday, 22 June, 2026  04:32:12 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

RANDY FLOWERS, pro se,      )

     Plaintiff,      )

v.      )    Case No. 26-cv-4062

ILLINOIS STATE BOARD OF ELECTIONS; )
BERNADETTE MATTHEWS, Executive Director; )
JEREMY KIRK, Assistant Executive Director; )
LAURA K. DONAHUE, Chair; )
RICK S. TERVEN, SR., Vice Chair; )
JENNIFER M. BALLARD CROFT, Member; )
CRISTINA D. CRAY, Member; )
TONYA L. GENOVESE, Member; )
CATHERINE S. MCCRORY, Member; )
JACK VRETT, Member; )
CASANDRA B. WATSON, Member; )

**FILED**

**JUN 2 2 2026**

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

---

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR LEAVE TO FILE

## SECOND AMENDED COMPLAINT

### INTRODUCTION

Defendants are attempting to turn this judicial proceeding into a law school style examination of clerical and technical details. That is not what this case is about. The matter before this Court concerns questions of constitutional law and their proper application—specifically, the constitutionality of Illinois's ballot access scheme—and that question cannot be avoided by focusing on extraneous assertions.

This case asks whether the Constitution permits Illinois to maintain a ballot access scheme so burdensome that even a major party incumbent, with full institutional support, could not gather a fraction of the signatures required of an independent candidate. It asks whether the

State may continue enforcing a statutory structure that the Seventh Circuit has already described as a "severe burden" and a "virtually insurmountable barrier." *Lee v. Keith*, 463 F.3d 763, 768–70 (7th Cir. 2006). And it asks whether an ordinary citizen—without an established party infrastructure, precinct committeemen to circulate petitions, the advantages of incumbency or trade union support, and facing an unattainable signature requirement—can ever hope to participate meaningfully in the democratic process as an independent candidate.

Defendants' filing does not address these constitutional questions. Instead, it focuses on unsubstantiated allegations, misstatements of case law, and the customary challenge to Plaintiff's standing, suggesting that Plaintiff—in the middle of court proceedings—should have complied with the very law he is challenging. Defendants' points ignore the central issue before this Court: Illinois's 5% signature requirement, combined with its compressed timeframe during the most unwelcoming winter and spring weather—complete with snow, sleet, ice, thunderstorms, hail, strong winds and tornado warnings—imposes a burden so severe that it effectively excludes independent candidates from the ballot. The Constitution does not permit such a barrier, and the State has offered no substantive response to justify it.

## ARGUMENT

### I. Defendants' Argument on Standing and "Self-inflicted Injury" is Legally Deficient

Defendants' misstate the injury, then attempt to reframe that injury as one of the Plaintiff's own making. Timely filing of petitions or related paperwork has never been at issue in this case, and Defendants' suggestion that Plaintiff's injury is "self inflicted" is baseless. Plaintiff did not create, contribute, nor further advance the severe burdens imposed by Illinois's statutory scheme. As Defendants are well aware, the Loyalty Oath is optional—a holdover from the McCarthy era—and not a requirement for ballot access, nor is it relevant to the constitutional burden analysis. Plaintiff had standing at the outset of this case and Plaintiff has standing now.

This Court has already rejected Defendants' standing argument. In its May 11, 2026 opinion, the Court held that a candidate suffers an injury in fact the moment he is "required to allocate additional campaign resources to gather signatures," and that such a burden "can be an injury to First Amendment rights." *Flowers v. Illinois State Board of Elections*, No. 4:26 cv 04062 SLD RLH, slip op. at 5–6 (C.D. Ill. May 11, 2026) (quoting *Krislov v. Rednour*, 226 F.3d 851, 857 (7th Cir. 2000)). The Court further held that even if a candidate "cannot yet know whether he will gather sufficient signatures," it is "certain that it [will] cost him more to do so than if the challenged provisions [are] invalidated," and therefore "there is no question of his standing." Id. (quoting *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004)). Defendants' attempt to revive an argument this Court has already rejected is therefore meritless.

## A. The Incumbent Congressman's Signature Count Corroborates the Severity of the Burden

What is relevant—and what corroborates Plaintiff's position—is that the incumbent Congressman, with the full support of a well established, district wide party infrastructure and precinct committeemen in every county, and a multitude of outdoor public events, was able to gather fewer than 3,300 petition signatures, as he publicly reported on Facebook. This is not an overwhelming number for an incumbent. This evidentiary admission demonstrates that the 16,035 signature requirement is unattainable in practice, and independently corroborates Plaintiff's claim.

Defendants' unverified assertion that Plaintiff made "no attempt" to gather signatures is a false narrative without merit and, like much of Defendants' brief, irrelevant to the constitutional questions before this Court. In fact, it was while gathering signatures that Plaintiff learned of additional barriers, the sum of which provides evidence that these burdens were not by accident, but very intentional. Defendant's disregard the governing standard of the Storer Test, namely,

"whether in the context of [State] politics a reasonably diligent independent candidate could be expected to satisfy the signature requirements or will only rarely succeed in securing ballot placement." *Storer v. Brown*, 415 U.S. 724, 742 (1974). In other words, is compliance realistically possible or rarely achievable?

Under the scrutiny of *Storer v. Brown* and the Seventh Circuit's application of that test in *Lee v. Keith*, where Illinois's ballot access scheme was found to impose a "severe" burden because no independent legislative candidate had qualified for the ballot in more than twenty five years, Defendants' "self inflicted injury" argument falls apart. *Lee v. Keith*, 463 F.3d 763, 768–70 (7th Cir. 2006). A plaintiff is not required to attempt the impossible or "go through the motions" of a futile exercise to establish standing or burden. The State's suggestion that Plaintiff should have complied with a statutory scheme that has excluded every independent candidate for decades is therefore legally irrelevant under *Storer* and *Lee* squarely rejects the state's position.

## II. Illinois's Historical Record Confirms the Severity of the Constitutional Burden

Having established that Plaintiff has standing and that Defendants' "self inflicted injury" argument is precluded by this Court's own precedent, the analysis turns to the severity of the burden imposed by Illinois's statutory scheme. The historical record provides the clearest evidence of that severity.

Illinois's historical record confirms that its ballot access scheme imposes a burden far beyond what the Constitution permits. Under *Storer v. Brown*, courts evaluating the constitutionality of signature requirements must examine the real world operation of the statutory framework. The Supreme Court expressly held that, in determining whether "a reasonably diligent independent candidate could be expected to satisfy the signature requirements or will only rarely succeed in securing ballot placement," the reviewing court must consider "not only past experience, but also the political reality" surrounding the scheme. 415 U.S. 724, 742 (1974).

This directive makes the historical record not merely relevant, but central to the constitutional inquiry.

Illinois's history satisfies the *Storer* test decisively. In nearly fifty years under the modern 5% requirement, not a single independent congressional candidate has qualified for the general election ballot. This is not a pattern of rare success; it is a pattern of total exclusion. The Seventh Circuit relied on precisely this type of historical pattern analysis in *Lee v. Keith*, striking down Illinois's legislative scheme because no independent legislative candidate had qualified in more than twenty five years—demonstrating that compliance was "virtually nonexistent in practice." 463 F.3d 763, 768–70 (7th Cir. 2006). If twenty five years of failure rendered the legislative scheme unconstitutional in *Lee*, then half a century of complete failure for congressional candidates renders the present scheme even more indefensible.

A statutory framework that has produced zero successful independent congressional candidates in five decades cannot, as a matter of constitutional law, be deemed one that a "reasonably diligent" candidate could navigate. It is the very definition of a system in which success is not merely rare, but impossible. Under *Storer* and *Lee*, Illinois's historical record is dispositive: the State's ballot access scheme imposes a severe and exclusionary burden that the Constitution does not tolerate.

Even accepting the Court's identification of seven independent candidates who appeared on the ballot since 2010, that number must be viewed in context. Over the same period, Illinois has conducted well over 150 general election contests for United States Representative. Seven independent candidacies across more than a decade of elections and scores of congressional races is not evidence of routine or regular access; it is evidence of rarity. Moreover, as the Court acknowledged, these candidates may have appeared on the ballot because their petitions were not challenged, because they qualified under reduced requirements in redistricting years, or through

other mechanisms unrelated to satisfying the 5% threshold. See *Gill I*, 2022 WL 992729, at *11–12; *Gill II*, 962 F.3d at 366. Thus, ballot appearance is not evidence of statutory compliance. The State has produced no evidence that any independent congressional candidate has ever satisfied the 5% requirement, and the Court made no such finding. Under *Storer*, the relevant inquiry is not whether a handful of candidates appeared on the ballot through procedural happenstance, but whether a "reasonably diligent" independent candidate could realistically satisfy the statutory requirement. 415 U.S. at 742.

The real-world operation of Illinois's statutory scheme further confirms the severity of the burden. During Plaintiff's 90-day circulation period—from late February through late May—there were no outdoor public events, festivals, or community gatherings at which signatures could be efficiently obtained. The first major outdoor event in Rock Island County, Mercado on Fifth, did not occur until May 22, just four days before the filing deadline, and about half of the people were from Iowa. By contrast, the incumbent Congressman collected his signatures during late summer and fall, when the district hosts its highest concentration of outdoor events, festivals, parades, and public gatherings. This disparity underscores the constitutional defect: independent candidates are forced to collect signatures during the least accessible period of the year, while major party candidates gather signatures during the most favorable conditions.

Under *Storer*, courts must consider "not only past experience, but also the political reality," 415 U.S. at 742, and this political reality confirms that a reasonably diligent independent candidate cannot realistically satisfy the 5% requirement. The statutory timing itself ensures that success is not merely rare, but practically impossible.

**III. The State Identifies No Prejudice, No Undue Delay, and No Bad Faith — and Rule 15(a)(2) Requires Leave to Amend in These Circumstances**

The State's Response does not identify a single factor that would justify denying leave under Rule 15(a)(2). The Seventh Circuit has made clear that amendments should be freely granted absent "undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice, or futility." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago*, 786 F.3d 510, 519–20 (7th Cir. 2015). None of these factors are present here.

There is no undue delay. Plaintiff moved promptly after identifying the need to clarify factual allegations and refine the constitutional claims. The case remains at an early procedural stage, with no discovery conducted and no scheduling order in place. Courts routinely grant leave in far later procedural postures.

There is no prejudice. The State does not argue that it would be burdened by responding to the SAC, nor could it. The SAC does not expand the scope of the litigation; it clarifies it. The State has not expended resources on discovery, expert preparation, or dispositive motions that would be undermined by amendment. The Seventh Circuit has repeatedly held that the absence of prejudice weighs heavily in favor of granting leave.

There is no bad faith. Plaintiff seeks only to present the constitutional claims with clarity and precision. The State identifies no improper motive, and none exists.

Finally, the State's suggestion of futility is misplaced. Futility is assessed under the Rule 12(b)(6) standard, and the SAC plainly states viable claims under Anderson–Burdick and the Equal Protection Clause. The State's futility argument is nothing more than a premature merits dispute, which is not a proper basis to deny leave. *Runnion* instructs that where the viability of claims is debatable, amendment should be permitted so that the issues may be resolved on a full record.

Because none of the Rule 15 factors weigh against amendment — and because the Federal Rules embody a strong presumption in favor of resolving cases on their merits — leave to amend must be granted.

## IV. The SAC Clarifies the Claims and Assists the Court in Reaching a Just Resolution

The proposed SAC does not alter the nature of the lawsuit; it clarifies it. It organizes the factual allegations, corrects statutory citations, and presents the constitutional claims in a manner that will assist the Court in evaluating the burdens imposed by Illinois's ballot access scheme. This is precisely the purpose of amendment under Rule 15.

The State's Response does not dispute that the SAC is clearer, more precise, and more helpful to the Court than the earlier pleading. Nor does the State dispute that the SAC corrects technical issues and integrates factual material that strengthens the constitutional analysis. These improvements weigh strongly in favor of granting leave.

The Seventh Circuit has emphasized that amendments which "clarify and sharpen the issues" should be permitted, particularly in constitutional litigation where the factual context is essential to proper judicial review. *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 687 (2004). The SAC does exactly that.

## V. The State Has Identified No Compelling Interest, and Its Argument Is Legally Deficient

Once the severity of the burden is established, the constitutional inquiry requires the State to justify that burden with evidence of a compelling interest. Here, the State offers none. Its silence on this essential element confirms the constitutional defect.

Defendants' assertion of a "compelling state interest" is wholly unsupported by evidence. The State offers no historical record, no legislative findings, and no empirical data showing that any problem existed before the enactment of the 5% requirement, nor that such a drastic burden is necessary to address any present concern. This failure is fatal.

When a ballot access restriction imposes a severe burden, the State must demonstrate that the law is "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). Mere speculation or generalized appeals to "ballot integrity" are insufficient. *Williams v. Rhodes*, 393 U.S. 23, 31–34 (1968). Here, the State has not identified a single concrete harm the statute was designed to remedy, nor any evidence that independent congressional candidates ever posed a threat to electoral stability.

In fact, the historical record shows the opposite: Illinois has experienced fifty years of total exclusion of independent congressional candidates without any corresponding evidence of abuse, confusion, or instability. A State cannot manufacture a "compelling interest" out of thin air, and it certainly cannot justify a half century of complete exclusion with no evidence that any problem ever existed.

This absence of evidence is particularly striking given the severity of the burden. Independent congressional candidates must gather 16,035 signatures, a requirement that is 18–23 times higher than the burden imposed on major party candidates, according to publicly available analyses of Illinois ballot access data. Even the incumbent Congressman—supported by a district wide party apparatus and precinct committeemen in every county—publicly reported gathering fewer than 3,300 signatures. This disparity underscores the constitutional defect: Illinois has imposed a signature requirement that even entrenched incumbents cannot meet, while offering no evidence that such a burden is necessary to protect any legitimate state interest.

The Supreme Court has repeatedly held that States may not rely on conjecture to justify severe burdens on ballot access. In *Williams*, the Court rejected Ohio's attempt to defend its exclusionary scheme with generalized claims about "ballot integrity," holding that such assertions cannot justify restrictions that make access "virtually impossible." 393 U.S. at 31–34. In *Norman*, the Court struck down Illinois's own ballot access restrictions because the State

failed to show that its burdens were narrowly tailored to any compelling interest. 502 U.S. at 289. And under *Storer v. Brown*, courts must examine "past experience" and "political reality" to determine whether a reasonably diligent candidate could realistically qualify. 415 U.S. 724, 742 (1974). Illinois's fifty year record of total exclusion answers that question decisively.

The State's failure to identify any compelling interest is not a minor omission—it is a constitutional failure. Under Anderson–Burdick, the severity of the burden dictates the strength of the State's justification. Here, the burden is severe, the exclusion is total, and the State's justification is nonexistent. A statutory scheme that has produced zero independent congressional candidates in five decades cannot be reconciled with the First and Fourteenth Amendments, and the State's silence on its supposed "compelling interest" confirms the constitutional infirmity. The burden imposed by Illinois's ballot access scheme falls not only on candidates but on the voters they seek to represent.

In the State of Illinois, unaffiliated voters constitute the second largest segment of the electorate, outnumbering Republicans and forming a politically distinct group. Yet Illinois's statutory framework has prevented these voters from supporting independent congressional candidates for nearly fifty years. Under *Storer*, courts must consider "political reality," including whether a reasonably diligent independent candidate can ever reach the ballot in a way that provides meaningful choice to voters. 415 U.S. at 742.

The exclusion of independent candidates therefore operates as a structural disenfranchisement of unaffiliated voters, who are denied any practical opportunity to support candidates aligned with their political identity. This voter level harm further confirms the severity of the burden under Anderson–Burdick and reinforces the constitutional defect identified in *Lee v. Keith*.

## VI. The State's "Modicum of Support" and "Ballot Overcrowding" Rationales Are Unsupported, Unequal, Arbitrary, and Constitutionally Deficient

Defendants assert a "compelling interest" in ensuring that candidates demonstrate a "modicum of community support" to prevent "ballot overcrowding." But the State offers no evidence — historical, empirical, or otherwise — that ballot overcrowding has ever occurred in Illinois congressional elections, let alone in the 17th District. The Supreme Court has made clear that when a State imposes a severe burden on ballot access, it must justify that burden with actual evidence, not speculation. *Williams v. Rhodes*, 393 U.S. 23, 31–34 (1968). Defendants provide none.

Illinois has not experienced a single instance of congressional ballot overcrowding in the last fifty years. To the contrary, the record shows the opposite: zero independent congressional candidates have qualified for the ballot in half a century. A statutory scheme that produces total exclusion cannot be justified by hypothetical concerns about excessive inclusion.

Even if the State's interest were legitimate in the abstract, the magnitude of the burden imposed on independent candidates bears no rational relationship to the interest asserted. The State claims that 16,035 signatures are necessary to demonstrate a "modicum of support," yet major party candidates in the same district need only 852 signatures (Democratic) or 744 signatures (Republican) to access the same general election ballot. The State offers no explanation — and there is none — for why a Democrat or Republican demonstrates a "modicum of support" with fewer than 1,000 signatures, while an independent must gather more than 16,000.

### Integration of Williams v. Rhodes

The Supreme Court has already rejected the very structure Illinois now defends. In *Williams v. Rhodes*, the Court held that ballot access laws violate the Equal Protection Clause

when they impose severe burdens that "give the two old, established parties a decided advantage" and make it "virtually impossible" for independents or new parties to qualify for the ballot. Id. at 31–32. Illinois's statutory scheme does exactly that. By requiring an independent candidate in the 17th District to obtain 16,035 signatures—while major party candidates need only 852 or 744— the State has created a structural barrier that entrenches the two major parties and excludes all others. This is precisely the kind of discriminatory burden *Williams* forbids.

As *Norman v. Reed* and *Anderson v. Celebrezze* later confirmed, States may not justify severe and unequal burdens on independent candidates by invoking interests they do not apply equally to major party candidates.

**Practical Burden Analysis (Integrated and Corrected)**

Although both independent and major party candidates technically receive a 90 day circulation period, the burdens imposed within those 90 days are radically unequal. Major party candidates must collect only 852 (Democratic) or 744 (Republican) signatures, while an independent candidate must collect 16,035 valid signatures — a requirement that, given typical invalidation rates, demands gathering between 23,000 and 40,000 raw signatures.

Moreover, the 90 day period for independent candidates occurs during the worst months of the year for signature collection — winter and early spring — when weather conditions include snow, sleet, freezing temperatures, and frequent storms. During this period, there are no outdoor public events, no festivals, and minimal foot traffic. As a result, independent candidates must rely almost entirely on door-to-door canvassing, which is exponentially more time consuming and yields far fewer signatures per hour than public event petitioning.

Major party candidates, by contrast, circulate petitions during late summer and fall, when weather is favorable and public events are abundant. They can gather signatures efficiently at

parades, fairs, sporting events, and community gatherings — opportunities that simply do not exist during the independent candidate circulation window.

Thus, even though the statutory period is the same length, the practical burden is not remotely comparable. Independent candidates must gather 20 times more signatures under far more difficult conditions, with no party infrastructure, and with no access to the public event environments that major party candidates rely upon.

This disparity is not a neutral regulation designed to ensure a "modicum of support." It is a structural barrier that prevents competition and entrenches the two party system — precisely the kind of unequal burden the Supreme Court condemned in *Williams*, *Anderson*, and *Norman*.

Because the State has failed to identify any evidence of ballot overcrowding, has offered no justification for the extreme disparity in signature requirements, and has applied its "modicum of support" rationale only to independents and new parties — not to Democrats or Republicans — its asserted interest cannot justify the severe burden imposed. Under Anderson–Burdick, the statute fails.

## VII. Response to Defendants' AI Accusation

Defendants' repeated focus on artificial intelligence is misplaced and irrelevant to the constitutional issues before this Court. While Plaintiff appreciates Defendants' apparent confidence that he would not make clerical mistakes absent the use of AI, Plaintiff has never claimed to be infallible. As a retired pro se litigant who has not litigated a case in many years, some filings may reflect a degree of rustiness, including a miscited case or less than ideal organization of supporting authorities. Plaintiff apologizes to the Court for these oversights. They were unintentional, reflect the challenges of litigating from a home environment without the benefit of paralegals or law clerks, and were not intended to distort these proceedings.

Plaintiff notes that he is not unfamiliar with legal work. Plaintiff graduated with honors from the Paralegal Program (A.A.S.) at Black Hawk College, completed an internship with the Law Offices of Walter Braud—now a retired Chief Judge of the Rock Island Circuit Court who endorsed Plaintiff's independent campaign—and litigated his first state constitutional case in 1993, long before artificial intelligence was available for public use. He is fully capable of drafting legal arguments, even if not to the same degree as he once did, and all arguments in this case have been his.

Defendants also criticize Plaintiff for not elaborating on his prior statement that the use of AI is not prohibited. The simple reason is the allegation—a personal attack upon Plaintiff—is irrelevant to the constitutional issues before the Court and appears intended solely to discredit Plaintiff rather than to advance any legal argument. Plaintiff has no interest in being drawn into the middle-school antics or collateral disputes intended to distract from the merits. Plaintiff has too much respect for this Court and the judicial process to be drawn down that road.

The Constitution—not Defendants' evaluation of Plaintiff—govern this case. Defendants' continued reliance on such insinuations only underscores that they have no substantive counterargument. The Constitution does not rise or fall on the formatting of a pro se filing, nor does the validity of a First and Fourteenth Amendment challenge depend on whether a litigant uses modern research tools. What matters is not the perfection of the filings but the merits of the constitutional challenge which Defendants have failed to address in any meaningful way.

Rather than confront the constitutional defects of Illinois's ballot access scheme, Defendants devote a substantial portion of their brief to unfounded accusations, innuendo, mischaracterizations, and personal insults — none of which substitute for a substantive response to the severe and exclusionary burden imposed by Illinois's statutory framework. Plaintiff brings this case not as a law office with institutional resources, but as a trained paralegal and former

litigant working independently after many years away from active practice. With those clarifications made, Plaintiff turns to the actual legal issues before the Court.

## VIII. The Anderson–Burdick Framework

Plaintiff applies the Anderson–Burdick balancing test as required. The burden imposed here is not theoretical or abstract; it is one Plaintiff personally encountered when attempting to comply with Illinois's signature requirement. The State's brief does not meaningfully dispute the severity of that burden. Instead, it focuses on matters unrelated to the constitutional inquiry.

Under *Anderson* and *Burdick*, the Court must evaluate both the character and magnitude of the burden and then weigh that burden against the State's asserted interests. Plaintiff respectfully submits that the burden is severe. That fact alone demonstrates the exclusionary nature of the law.

Although both independent and major party candidates technically receive a 90-day circulation period, the burdens imposed within those 90 days are radically unequal. Major party candidates must collect only 744 (Democratic) or 852 (Republican) signatures, while an independent candidate in the same district must collect 16,035 valid signatures — a requirement that, given typical invalidation rates, demands gathering between 23,000 and 40,000 raw signatures.

The State offers no explanation for why a Democrat or Republican demonstrates a "modicum of support" with fewer than 1,000 signatures, while an independent must gather more than 16,000 to prove the same thing.

Moreover, the 90 day period for independent candidates occurs during the worst months of the year for signature collection — winter and early spring — when weather conditions include snow, sleet, freezing temperatures, and frequent storms. During this period, there are no outdoor public events, no festivals, no farmers' markets, and minimal foot traffic. As a result,

independent candidates must rely almost entirely on door to door canvassing, which is exponentially more time consuming and yields far fewer signatures per hour than public event petitioning.

Major party candidates, by contrast, circulate petitions during late summer and fall, when weather is favorable and public events are abundant. They can gather signatures efficiently at parades, fairs, sporting events, and community gatherings — opportunities that simply do not exist during the independent candidate circulation window.

Thus, even though the statutory period is the same length, the practical burden is not remotely comparable. The State's assertion that the 90 day period is "equal" ignores the reality that independent candidates must gather 20 times more signatures under far more difficult conditions, with no party infrastructure, and with no access to the public event environments that major party candidates rely upon.

This disparity is not a neutral regulation designed to ensure a "modicum of support." It is a structural barrier that prevents competition and entrenches the two party system — precisely the kind of unequal burden the Supreme Court condemned in *Anderson*, *Norman*, and *Williams v. Rhodes*.

The State offers no substantive response to this point. It does not explain how a requirement that even an incumbent cannot satisfy can be considered a neutral administrative measure. Nor does it identify any interest that justifies such a barrier. The absence of a meaningful defense under Anderson–Burdick speaks for itself.

## IX. *Lee v. Keith* Controls This Case

Plaintiff relies on *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006), because it remains the controlling authority in this Circuit on the constitutionality of Illinois's signature requirements

for independent candidates. The State's brief does not engage with *Lee* in any substantive way. Instead, it attempts to distinguish the case on grounds that do not withstand scrutiny.

In *Lee*, the Seventh Circuit held that Illinois's signature requirement, combined with its restrictive filing window, imposed a severe burden on independent candidates. The Court emphasized that the law effectively prevented candidates from gaining access to the ballot, thereby undermining the principles of democratic participation.

The same constitutional defect exists here. Plaintiff faced an insurmountable burden under a statutory scheme that has only become more restrictive since *Lee* was decided. The State does not dispute this reality. It offers no explanation for why a requirement that was unconstitutional in 2006 has somehow become constitutional today.

Plaintiff respectfully submits that *Lee v. Keith* is not merely persuasive; it is binding. And Defendants have not provided any substantive response that would justify departing from it.

## X. Correction Regarding Citation to *Navarro v. Neal*

Plaintiff respectfully clarifies that the Seventh Circuit's controlling precedent addressing the severity of Illinois's ballot access requirements for independent candidates is *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006), not *Navarro v. Neal*, 716 F.3d 425 (7th Cir. 2013). The prior reference to *Navarro* was an inadvertent miscitation. *Lee* squarely holds that Illinois's statutory scheme imposes a "severe burden" and operates as a "virtually insurmountable barrier" to independent candidates, id. at 768–70, and therefore governs the constitutional analysis presented in this case. Plaintiff submits this correction to ensure the accuracy of the record and the proper identification of controlling authority.

## XI. Constitutional Analysis

The constitutional injury in this case is straightforward. Plaintiff attempted to access the ballot and was prevented from doing so by a statutory scheme that imposes a burden far beyond

what the Constitution permits. The injury is not speculative. It is not hypothetical. It occurred when Plaintiff was denied the opportunity to appear on the ballot despite making a good faith effort to comply with the law.

The State's brief does not address this injury. Instead, it focuses on matters unrelated to the constitutional question. Plaintiff respectfully submits that the Constitution requires more than procedural diversions. It requires a meaningful examination of whether the law at issue aligns with the principles of self government and equal access to the electoral process.

Illinois's statutory scheme fails that examination. It imposes a burden that is neither reasonable nor justified by any legitimate state interest. The Constitution does not permit barriers that functionally exclude independent candidates from the ballot. Yet that is precisely what the current law does.

## XII. Conclusion

Plaintiff respectfully asks the Court to look past the diversions raised in Defendants' brief and focus on the constitutional issues that remain unanswered. The question before the Court is not whether Plaintiff's filings are perfectly polished, but whether Illinois's statutory scheme imposes a burden the Constitution does not tolerate. When the merits are confronted directly, the answer becomes clear: a requirement that even a major party incumbent cannot satisfy is not a neutral administrative measure but an exclusionary barrier incompatible with democratic principles.

Defendants have not meaningfully addressed this reality or offered any substantive justification for the severe and unequal burdens imposed by Illinois's ballot access framework. Because none of the Rule 15 factors weigh against amendment — and because the Federal Rules embody a strong presumption in favor of resolving cases on their merits — Plaintiff respectfully requests leave to file the Second Amended Complaint.

Respectfully submitted,

Randy Flowers
Pro se, Plaintiff
2509 30th Street
Rock Island, IL 61201
Email: my4kidsdad@netzero.net
Phone: 309-428-9682

## CERTIFICATE OF SERVICE

I certify that on June 22, 2026, I filed the foregoing PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT in person.

Randy Flowers
Pro se, Plaintiff